**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA

     v.                                   No. 17-CR- 630 (ER)

DAVID PIKE,

        Defendant.
_____/

### DEFENDANT DAVID PIKE'S SENTENCING MEMORANDUM

Defendant David Pike, by and through his counsel, respectfully submits this memorandum and the accompanying exhibits in connection with the sentencing hearing scheduled for February 18, 2022.

## I.    INTRODUCTION

On October 19, 2021, pursuant to a plea agreement with the government, David Pike pled guilty to one count of conspiracy to commit bank fraud in violation of 18 U.S.C. 1344. The offense, which occurred in 2016, involved Mr. Pike's intentional withholding of material information from banks to cause them to open accounts and transfer funds associated with a series of investment funds with which he was associated. There was no loss to the banks as a result of the conduct at issue, nor did Mr. Pike intend that the banks suffer any loss. Mr. Pike, who has no prior criminal history, was released on bond shortly after his arrest on August 30, 2019.

In the intervening two and a half years, he has been in full compliance with the conditions of his release.

The advisory Sentencing Guidelines call for a term of imprisonment of 6 to 12 months. Since the Guidelines range is in Zone B of the Sentencing Table, the minimum term may be satisfied by imposition of a sentence of probation with a condition of home detention pursuant to the schedule provided in § 5C1.1(e). That schedule would require one day of home detention for one day of imprisonment.

We respectfully submit that the Court should follow the recommendation of the Probation Office and impose a sentence of two years' probation with a special condition of three months' location monitoring. *See* PSR at 33-34. This is a reasonable sentence – one that is sufficient and not greater than necessary to satisfy the factors outlined in 18 U.S.C. § 3553(a). The recommended sentence would require a minor variance from the advisory Guidelines range, but that variance is amply justified based on the history and characteristics of the defendant, the nature of the offense, the absence of need for additional punishment or deterrence, and the particular family circumstances arising out of the special needs of Mr. Pike's son, David, Jr.

## II.    BACKGROUND

David Pike is a generous, hard-working, and honorable man. His 62 years of education, employment, and active community involvement are unblemished by any hint of criminal or unethical behavior but for the instant offense. Mr. Pike's life has been distinguished by extraordinary devotion to his family, his friends, and to the

autism community he joined when his eldest son, David Jr., was diagnosed as a young child. Consider the words of those who know him well:

- Sean Strache is a friend and former business colleague:

  We were close friends with the Pike's when they learned that their son David Jr. is on the autism spectrum. It is at this point that I really learned the true character of the man. Dave threw everything he had into what had to be done to help David Jr. achieve and learn . . . I saw him give up his professional career and start a school for Autistic children in order to provide the best care for not only his child but other children and parents in their situation. . .. Dave changed the trajectory of his whole future to best serve his family and others in the Autism community. . . I can honestly say that I have never met a finer individual than David Pike. Ex. 1 (Sean Strache Letter).

- Dr. Michael Alessandri is an internationally recognized leader in the education and treatment of children and adults with autism spectrum disorder[1]:

  Mr. Pike and his wife became colleagues when they bravely took on a new and challenging venture to open a therapy center and school for children with autism. Crystal Academy was formed out of their desire to provide high-quality care for others who found themselves on the same journey as their own family. They had a vision to serve as many individuals in need as they could through this venture, and therefore launched this evidence-based treatment and education center in Coral Gables. Mr. Pike, along with his wife, are community leaders of the highest caliber. They took their own challenges with their son and turned them into meaningful "pay it forward" contributions to our community that promote the well-being of others." Ex. 2 (Dr. Michael Alessandri Letter).

- Thomas Mooney met Mr. Pike ten years ago when he enrolled his son at Crystal Academy:

  David and I quickly shared a common bond in that we both had very young sons with ASD . . . I also saw, first hand, the passion David has for treating children with ASD and how his vision has resulted in the Crystal Academy

---

[1] Dr. Alessandri is a Clinical Professor of Psychology and Pediatrics at the University of Miami and Executive Director of the University of Miami-Nova Southeastern University Center for Autism and Related Disabilities.

becoming a leader in providing exceptional learning and therapy services. . .
my experience and interaction with David has always revealed a high degree
of professional integrity, honesty, and compassion on his part. Ex. 3 (Thomas
Mooney Letter).

- Ashley Cunill met David Pike in 2009 when, fresh out of college and looking

  to begin a career helping special needs children, she was hired for a job at the

  newly founded Crystal Academy:

  Since starting at [Crystal Academy], David witnessed my growth
  professionally but also personally. He supported me through starting and
  completing grad school (2012-2015), getting engaged (2012), buying my first
  home (2014), then married (2014), and other life crisis that affected my
  family. Through the hard times that hit our family, David & his wife were my
  constant support. He opened up his home whenever I needed somewhere to
  go, he offered financial help when I couldn't afford bills because my husband
  lost his job, and gave me fatherly advice when I had to make difficult adult
  decisions. . .. He is a highly respected and admired person, not only by me,
  but all the parents here at Crystal Academy. Ex. 4 (Ashley Cunill Letter).

- Bill White and Ryan Reed are the Pastors at Christ Journey Church where

  Mr. Pike began attending services with his wife upon their marriage, by

  Pastor White, in 1999:

  Each week they sit front and center inside the auditorium. Frequently we
  observe both David and Mary taking notes during the message and engaging
  in the worship life of the community in a meaningful and true way. Soon
  after David and his family started attending our church, they began to
  volunteer in various capacities throughout the church. Most notably, David
  helped the kids' ministry launch a weekly theatrical production called Fam
  Jamz. In this environment he often danced, acted, and led elementary aged
  kids into a deeper understanding of Jesus as their Lord and Savior . . . Since
  we have known David, he has always offered his talents and gifts to the
  church without cost or hesitation.  Ex. 5 (Bill White and Ryan Reed Letter).

- Maria "Mary" Palacio is David's wife:

  Looking back since my husband and I became a family more than 20 years
  ago, I see the many tests we have faced through the years, including the
  daunting day when the Autism diagnosis entered our lives with our firstborn

son David Jr. All through these 20 years, my husband David has been an impeccable and dedicated father, loyal husband, hard worker, autism advocate and cheerleader for our family. He is the best guy for this job – truly an amazing human being. Ex. 6 (Maria Palacio Letter).

- Marie Mesmer has known Mr. Pike for 43 years – they have been close

  friends for 20 of those years:

  David Pike [ ] provided me the moral strength during the decade it took me to complete my studies and teach in a foreign country. I am the person and professor today in large measure because of David . . . I now teach and conduct research in the field of marriage and family. I know firsthand the courage it took David to act in the face of fear over having a son on the severe end of the autistic spectrum. He and his wife have worked very hard to have an extraordinary marriage in the face of adversity. I use their story in my marriage and family classes as a classic case study in how to face adversity with dignity, grace, integrity, and humor . . . David Pike may be vulnerable and flawed but he is also an honorable and moral man with a great deal of integrity. He possesses the ability to learn from his failures in his quest to be the best person he can be on behalf of his family, friends, and community. Ex. 7 (Marie Mesmer Letter).

So, the obvious and important question is: How did this good man who, for six decades, lived an exemplary, law-abiding life end up before this Court to be sentenced for a serious crime to which he has pleaded guilty and accepted full responsibility? As Ms. Mesmer observes, Mr. Pike's aberrant involvement in this offense was born of a "heartfelt and sincere desire to provide for his family [that] led him to accept a business opportunity beyond those in the Autism community." Or, to repeat the wise English proverb, the road to hell is paved with good intentions.

The "business opportunity" at issue was offered by co-defendant Mark Scott, a successful, smart, and engaging corporate lawyer at Locke Lord who the Pikes met through mutual friends. Before long, Scott – who was going through a divorce from his first wife – became a frequent visitor to the Pike home where, over food

and drink, he enjoyed the friendship and support characteristic of David and Mary. Scott was impressed with the Pikes' accomplishments in the autism community and donated generously to Crystal Academy. He recognized that Mr. Pike had given up the potential for a more lucrative career in computer technology to spend more time focused on the needs of his Autistic son (and the challenges Autism brought to the whole family) and to run a non-profit school that provided significant personal rewards but, at best, a very modest salary.[2] In retrospect, and viewed most charitably, Mr. Scott saw an opportunity to help his friend improve his financial condition while at the same time provide himself with a hard-working employee who, though intelligent and a quick study, knew nothing about operating investment funds – let alone foreign ones – or the requirements of banks conducting KYC diligence. Scott likely assumed, correctly and regrettably as it turned out, that David would defer to the high-powered and confident corporate lawyer he knew and trusted and not question his advice, even when that advice was counter-intuitive for a man of David's intelligence and character.

So it was that in the early spring of 2016, Scott told Pike he, Scott, had an opportunity to become more directly involved in the business dealings of clients for which he had been providing legal advice at his firm. As Scott explained, this, not lawyering, was where real money could be made. Scott told Pike that he would be setting up and managing foreign investment funds. The initial investors were to be

---

[2] Mr. Pike worked full time for seven years building Crystal Academy. He received no salary for the first two years and for the next seven years received an annual salary ranging from $50,000 to a high of $85,000. Since 2016, as he has played a reduced role, Mr. Pike has received no more than $25,000 annually.

a client of Locke Lord (who turned out to be Ruja Ignatova) and other wealthy foreign investors.

Scott hired David, part-time initially, to help him set up the files and handle paperwork associated with the new business. Scott assured David that he would explain the required tasks to him and provide explicit instructions. Scott seemed genuinely interested in helping David develop a source of income that could better support his family financially and provide a "nest egg" for the long-term needs of David, Jr. That was certainly what motivated David to accept Scott's offer. The part-time job soon turned into a full-time job, and eventually Scott told Pike he would pay him 10% of what he, Scott, was earning for managing the Fenero Funds.[3]

At the outset of the relationship, Scott provided Pike with much of the same information that was ultimately provided to the banks and fund administrator, including for example information like that contained in the Fenero Mission Statement describing the investors as a "select group of European based families and companies" who had "been represented legally by Mr. Scott ranging from three (3) to twelve (12) years and have closed on in excess of $2,100,000,000 in transactions under Mr. Scott's business and legal guidance." PSR at 10, ¶30. Before long, however, Scott told Pike that the Fenero Funds would not be investing the assets of his client Ruja Ignatova, the owner the cryptocurrency company OneCoin,

---

2 Mr. Pike received approximately $1,200,000 over the course of his involvement with Scott and the Fenero Funds. He reported and paid tax on all of it. Based on Scott's promise of a 10% commission of profits, Pike assumed, incorrectly it appears, that Scott's corresponding earning were in the range of $10 million – quite a significant sum, but not nearly the $50 million described at Scott's trial. And, while Mr. Pike has agreed to a $2,099,330 forfeiture judgment, the difference between that amount and the $1,200,000 he received in compensation was not money he ever touched; it was legally attributable to him as his name was on bank accounts owned and controlled by Scott and through which funds traceable to the scheme passed.

because banks were extremely skeptical of cryptocurrency in general and would be less likely to open accounts if funds from OneCoin were involved. However, Scott explained, the Funds could continue to receive the money of the other wealthy European investors, even though some of them were associated with Ignatova, including Irina Dilkinska who was Ignatova's attorney and had a OneCoin email address. At this point, Pike had good reason to suspect that at least some of Dilkinska's funds had been acquired through her relationship to Ignatova and/or OneCoin, but the connection between the two and its implications were far from clear. David was overwhelmed with documents and the learning process and paid little mind to the issue. At Scott's direction and under his guidance, Pike began the process of gathering KYC information from the investors and submitting it to the fund administrators, Apex and others, for ultimate transmittal to banks. The information provided to him was detailed and voluminous: CV's, passports, corporate documents, bank account information, proof of long-term residence, letters of character, and wealth confirmation from attorneys. He did not question that the investors were who Scott told him they were and who they purported to be.

However, as time went on, the relationships between and among the investors, particularly involving Dilkinska and OneCoin, became increasingly apparent to David. Nevertheless, in the summer of 2016, when Apex learned of Dilkinska's connection to OneCoin and began conducting enhanced due diligence on the Fenero investors, Scott told David that he was to withhold from Apex any documents or information that would reveal the relationship between any of the

investors and OneCoin or Ignatova. He told Pike that Apex and the banks did not need the information, that the law did not require it, and that it was improper and overreaching for them to demand it. David, no doubt influenced by the financial rewards of his new employment, wanted to believe Scott, and so he followed Scott's instructions and withheld information about the investors that he knew Apex, acting on behalf of the banks, had requested and was important to their decision-making. To justify his actions, Pike told himself that Scott was an experienced corporate lawyer who understood the relevant legal and business requirements and upon whose instructions and assurances he could rely. But, in his head and heart, David knew what he was doing was wrong and that by withholding the requested information, he was improperly misleading the banks. Purposefully deceiving a financial institution, or anyone for that matter, was wholly out of character for David, and he deeply regrets the choice he made.

By August of 2016, when Pike learned that Irina Dilkinska, Ignatova's lawyer and OneCoin associate, was signing wire transfer authorization letters for tens of millions of Euros on behalf of the other, supposedly independent, investors (PSR at 11-12, ¶¶ 36 & 37), it was apparent to him that Dilkinska was acting on Ignatova's behalf and that at least a substantial portion (and potentially all) of the invested funds were derived from OneCoin and belonged to Ignatova or some combination of Ignatova and Dilkinska. Yet, when interviewed by the government in December of 2018, after Scott had been indicted, Pike denied contemporaneous knowledge of this fact in an effort to minimize his conduct. He may not have had

actual knowledge that all the invested funds were Ignatova's, but, as David now admits, he consciously avoided recognizing the obvious conclusion to be drawn from the facts of which he was aware at the time. This is the false statement conduct referenced in the Plea Agreement and the PSR for which David has accepted responsibility as part of the offense conduct.

All this said and the full scope of the relevant conduct acknowledged, it bears emphasis that David Pike was not privy to the majority of the sophisticated machinations engaged in by Scott and others to conceal the relationship between the purported investors and OneCoin.[4] Scott had no reason to share this information with Pike and he did not. David never met nor even spoke with Ignatova, Dilkinska or any of the other players in the scheme save Gilbert Armenta, with whom, he told Scott emphatically, he had no interest in doing business. *See, supra,* n. 4. Pike's knowledge was circumscribed by the documents Scott provided him and the emails he was copied on or directed to send. David had corporate titles, a record keeping job, and admittedly served a significant purpose in the operation of the Fenero Funds for the benefit of Scott and the "investors".[5] But he was decidedly

---

[4] For example, Pike was unaware of the extent of Scott's deceptive activities concerning the CryptoReal and Barta Holdings transaction as described in the PSR at ¶¶ 39-41. He did not know that "SCOTT disguised the transfer of OneCoin fraud proceeds on IGNATOVA's behalf in the form of a fake loan to CryptoReal Investments Trusts, Ltd.," (PSR at ¶39). Pike believed Scott when he told him – as he had told Apex – that "Neil Bush was the authorized representative of Barta." *Id.* Nor did Pike know that Gilbert Armenta was one of Ignatova's "main money launderers" (PSR at ¶41) and that the $10 million in the Fates Group account belonged to her. In fact, Mr. Pike met Armenta one time – months before he began working for Scott and the Fenero Funds. Scott introduced Armenta to Pike as someone who might want to hire Pike to provide computer tech support. Pike took an instant dislike to Armenta and told Scott he had no interest in working for him.

[5] As noted in counsel's letter response to the initial PSR, Mr. Pike's role as Chief Operating Officer was, a practical matter, akin to that of an office manager. As the PSR recognizes at ¶26, his primary role was to assist Scott with collecting, organizing, and presenting KYC documentation to the fund

*not* part of their inner circle. In fact, he presented more risk than reward. David had no inkling that OneCoin was a fraud scheme or that the invested funds were otherwise the product of illegal activity. Throughout his involvement, David believed that OneCoin was a legitimate cryptocurrency – a high-risk investment to be sure (and one that, like most cryptocurrencies, had drawn some negative attention and civil suits) – but not a scam.

## III.  LEGAL ARGUMENT

"It has been universal and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify the crime and punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). A district court should begin the sentencing analysis by calculating the applicable Guidelines range. *Rita v. United States,* 551 U.S. 338, 351 (2007). However, while a court is required to consider the Sentencing Guidelines, it is not bound by them. *United States v. Booker*, 543 U.S. 220, 264 (2005). The law permits the court to sentence outside the Guidelines where it is "reasonable" to do so. *Booker*, 543 U.S., at 261-262. A minor variance from the Guidelines requires a less significant justification than does a major variance. *Gall v. United States*, 552 U.S. 38, 50 (2007).

---

administrators for ultimate transmission to financial institutions. And while Pike also served as a director of MSSI BVI, that title was largely a matter of form and convenience dictated by his role in the KYC process. As Scott explained to him, he needed a second signatory on the bank paperwork with which Pike would be assisting, and Pike's appointment as a director of MSSI BVI accomplished that.

### A. Unresolved Objections to the PSR

The unresolved objections noted in the Addendum to the Presentence Report (PSR at pp. 30-32) all represent Mr. Pike's effort to clarify that, despite the PSR's extensive recitation of the activities of Mr. Scott and the others involved in the money laundering conspiracy: 1) Mr. Pike's role was limited to participation in the bank fraud conspiracy which resulted in no loss and no restitution obligation; 2) Mr. Pike did not know that OneCoin was a fraud scheme or that the invested funds were criminally derived; 3) and Mr. Pike's knowledge of Ruja Ignatova's ownership of the $400 million transferred to the Fenero Funds evolved over time, and it was not until the summer of 2016 that he fully realized that all or substantially all of the $400 million belonged to Ignatova and was derived from OneCoin. The fact remains that Mr. Pike admits he made the false statements to the government in 2018 regarding the state of his knowledge as to the source of the funds. These are positions, we understand, the government does not dispute in any material respect. Nevertheless, in light of the clarifications to the PSR made by the Probation Officer and the explanation provided to the Court herein, Mr. Pike waives any remaining objections to the PSR.

### B. The Guidelines Permit a Sentence of Probation with Conditions

The parties and the Probation Officer agree that the advisory Guidelines range is 6 to 12 months. The calculation begins with a Base Offense level of 6. There is no loss adjustment as there was no actual or intended loss to the financial institutions arising from the offense conduct. A two-level increase applies as a

substantial part of the scheme was committed from outside the U.S. and the offense involved sophisticated means; because the resulting offense level is less than 12, the offense level is increased from 6 to 12. As Mr. Pike has accepted responsibility, the offense level is decreased by 2, resulting in a Total Offense Level of 10.[6]

Mr. Pike has no criminal history, so his advisory Guideline range places him in Zone B, rendering him eligible to serve his minimum term through a sentence of probation with a special condition of home detention, U.S.S.G. § 5C1.1(c)(3), pursuant to the schedule provided in U.S.S.G. § 5C1.1(e). The § 5C1.1(e) schedule requires one day of home detention for one day of imprisonment. Thus, only a slight variance from the Advisory Guidelines would permit Mr. Pike to serve a sentence of probation with location monitoring as recommended by the Probation Office. As demonstrated below, that is a reasonable sentence, consistent with application of the § 3553(a) sentencing factors. It is particularly justified by the family circumstances arising out of the special needs of Mr. Pike's autistic son, David, Jr., in whose life Mr. Pike plays a central and essential role.

---

[6] In the Plea Agreement, the parties stipulated that Mr. Pike's false statements to the government during a debriefing, *see, supra,* at 9-10, constitute relevant conduct pursuant to 1B1.1.3 or other conduct that may be considered at sentencing pursuant to 1B1.1.4. The parties also agreed that the bank fraud conduct and the false statements conduct are appropriately grouped under U.S.S.G 3D1.2(d) such that no increase in the offense level is appropriate. The Probation Office agrees. The false statement conduct was separately considered by the Probation Office for a potential Obstruction of Justice adjustment. The government advised that the false statements did not hinder or impede its investigation or prosecution of the offense, and an obstruction adjustment was determined not to apply. PSR at 15, ¶¶ 50-51. Accordingly, the false statement conduct has been fully considered in the Total Offense level.

## C. A Minor Variance to Permit Mr. Pike to Serve a Non-Custodial Sentence Is Justified by Family Circumstances

David Pike and Mary Palacio were married in 1999 and have two sons, David, Jr., who is 19 and Joshua who is 17. Joshua is a senior in high school and will be heading off to college in the fall. David Jr.'s life is more complicated. He was diagnosed with moderate to severe autism spectrum disorder (ASD) as a young child. Since then, the Pikes have immersed themselves in the job of providing David with the best possible environment in which to overcome the challenges of ASD and its related developmental delays. In 2009, when the Pikes determined that there were no programs in the Miami area that could provide ongoing therapy of the type David needed, they took matters into their own hands and founded the Crystal Academy Therapy Center for developmentally delayed children. Two years later, they expanded the school to provide a primary education program.

David Jr. attended Crystal Academy for many years. He has been enrolled in a special needs inclusion program in a neuro-typical private school for the past three years to provide the positive influence of non-Autistic peers. This is his last year in his school. In May, David, Jr. will begin the transition to life outside the familiar structure and therapy provided by his schools. As described by Dr. Michael Alessandri:

> [David, Jr.] is about to enter the most difficult part of the autism journey. We talk in our field about the "cliff" that individuals fall from when they age out of school, and that cliff is indeed very real. Life for David Jr. will become even more challenging as his family works to cobble together supports and services in terms of post-secondary education, employment, housing, and community life. This is a lifelong journey for parents, and the presence of a father in this journey for a son is critical. Ex. 2 (Alessandri Letter).

And, as Dr. Alessandri observes, Mr. Pike "is quite simply an extraordinary father who plays a central role in the life of his sons, but particularly his son with autism. As this child now becomes a young man, Mr. Pike's role is becoming more prominent than ever as he guides him into and through the complexities of adulthood. . ." *Id.*

Tanya Sanchez[7] was, for years, David Jr.'s main provider for speech, language, and behavioral therapies at Crystal Academy. She speaks to the specifics of the critical role Mr. Pike plays in his son's life:

> The bond between the two David's was and is critical for the child's progress. David Jr. has a diagnosis of Autism, intellectual disability and comorbid anxiety disorder. He understands where his father is going but time and change is very difficult for David, Jr. to manage. When Mr. Pike traveled, it was always evident in his son's behavior. He does well with predictability and structure and conversely, will engage in self-injurious behaviors, such as hitting his head if very anxious. David Jr. requires constant supervision, he is unable to navigate the community and the world outside of his home independently. Simple things such as crossing a street, continue to be a safety hazard for David Jr. at 19 years old. His parents have worked tirelessly in constructing a program that offers predictability and structure for their son to be successful on a daily basis . . . But he cannot survive without his parents, more so his father who has taken on the role of going into the community with David when he is out of therapy. Ex. 8 (Tanya Sanchez Letter).

Ashley Cunill was until recently the Director of Services and the Speech Language Pathologist at Crystal Academy. Over the course of 13 years, Ms. Cunill worked with David Jr. and observed the Pike family both at school and in their home:

> David Jr. can't necessarily be told something 1 time and expect him to understand and process it all. David Jr. is literal. He requires every detail of every step not only to be told to him, but shown to him, over and over until he

---

[7] Ms. Sanchez has a master's degree in speech pathology, is a Licensed Speech Pathologist, and a Board-Certified Behavior Analyst.

grasps the concept and understands. David Sr is that person for David Jr, and I have been blessed to see first-hand how caring and compassionate David Sr is. He does not get frustrated, he works at David Jr's pace, he repeats steps 1 time or 1 million times, whatever is needed so that David Jr understands. David Jr. adores his father. They have a bond that is unique and indescribable. They understand each other, and simply put, need each other. Ex. 4 (Ashley Cunill Letter).

Mary Palacio, David Pike's wife, writes eloquently and from a unique perspective about the challenges facing her family as Joshua prepares to leave for college, her husband faces the possibility of imprisonment, and David Jr. prepares to transition from school to an uncharted future without the family structure and predictability he has known his entire life:

> This year has already begun with extreme pain, with the unexpected loss of my father on January 23.  Family is our backbone and as we gathered in Puerto Rico for his burial, waves of sorrow and imminent separation began to feel like a second skin. As we mourn our loss, we also worry about the impact it is having on our boys, and especially on David Jr (19). For David things are different. The need for structure, dependability and family ties is his lifeline. A constant question from our son is "Where is?" He asks, Where is dad? Where is Joshua? What time he getting home?  He becomes unsure and agitated at relatively minor deviations to routine, unable to perform otherwise normal functions. I fear that larger changes to his routine, the fear of not understanding abstract concepts and the anxiety of not knowing what's next will bring a chain reaction that will deeply affect his self-esteem, sense of being, and security. Loss is a concept that is hard for us to explain and even harder for him to understand.  Ex. 6 (Maria Palacio Letter).

Mary describes the critical, albeit exhausting, role her husband plays in David, Jr.'s daily life – the near-constant engagement through playing games, cooking together, answering questions, and predicting his son's needs as his brain struggles to find words to communicate them.  As she says, "My husband David is not only David Jr.'s dad, but he is also his only friend."

The reality is, if Mr. Pike is imprisoned the overall objective of the sentencing process will not be advanced – for the sentence is greater than necessary to comply the purposes of 18 U.S.C. 3553 (a) – yet the negative consequences to David Jr.'s sense of security and development will, in all probability, be substantial and long-term. Collateral consequences such as these are appropriately considered in the sentencing analysis. *See United States v. Lehmann,* 513 F.3d 805, 809 (8th Cir. 2008) (upholding variance from advisory Guidelines range of 37 to 46 months and imposing a sentence of probation with six months community confinement where "sending [the defendant] to prison would have a very negative effect on the emotional development of her young son, which is not materially different from the sort of 'compelling family circumstances' that the Supreme Court indicated would justify probation for a drug trafficker with a similar advisory guidelines range," *citing Gall v. United States*, 552 U.S. 50. *See also United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence").

Here, the requested variance from the Guidelines range is considerably less significant than the variances granted in *Lehmann* and *Gall*. Since a probationary sentence with appropriate conditions is already permitted by § 5C1.1(c)(3) (albeit pursuant to the § 5C1.1(e) schedule requiring one day of imprisonment for one day of home detention), only a minor variance is justified to avoid the collateral consequences imprisonment would have on David, Jr., and the rest of the Pike

family. *See Gall,* 552 U.S. at 50 ("We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one").

### D. A Non-Custodial Sentence Is Consistent with the § 3553(a) Sentencing Factors

A non-custodial sentence is also consistent with the sentencing factors identified in 18 U.S.C. § 3553(a). The statute initially directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." § 3553(a)(1).  As detailed above and as evidenced by the letters attached as Exhibits 1 through 8, David Pike is good man who has lived a commendable and otherwise law-abiding life. He is devoted to his family, loyal and generous to his friends, and has contributed mightily to his community. There is no question but that his participation in this offense was aberrational. *See* PSR, p. 24 ("Pike is a first-time offender who appears to have otherwise been a law-abiding and contributing member of society, thereby evincing that his participation in this crime truly represents aberrant behavior").

The offense itself was a serious one and cannot fairly be described as victimless. But significantly, it resulted in no loss to the banks who were the subject of the deception. Nor was the absence of loss the result of accident, diligent avoidance by the banks, or incompetence of the wrongdoer. Loss was never intended nor expected. Pike knew the banks were concerned about funds sourced to cryptocurrencies like OneCoin because Scott told him so. But he also knew the goal was to open accounts into which millions of Euros – not OneCoin tokens – were to be deposited. David's conduct was intentionally and unlawfully deceptive, but he

did not foresee, let alone intend, that the banks would suffer any loss if he followed Scott's direction to conceal the source of the funds. The Court may also consider the fact that Mr. Pike did not set out to commit this, or any, crime. His motivation at the outset was noble: To provide financially for his family after years of contributing boundless time, energy, and heart, but little income. While not an excuse – but in mitigation – Pike was a follower, not a leader.

The goals of deterrence and just punishment, *see* § 3553(a)(2), are also adequately addressed by a non-custodial sentence. The Court can be assured based on Mr. Pike's past history and his behavior during the pendency of this case, that his first encounter with the criminal justice system will be his last. His age alone supports the recommended non-custodial sentence. Indeed, the Second Circuit has accepted the Sentencing Commission's conclusion that recidivism decreases with age, and over 90% of first-time offenders over the age of 50 never commit another crime. *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017).

Beyond his age and a history of law-abiding behavior, Mr. Pike has already suffered consequences that argue against the need for additional deterrence and punishment beyond the recommended probationary sentence. He was arrested on a criminal complaint charging a Section 1001 violation in the early morning of August 30, 2019, at his home and in the presence of his wife and children. It was the Friday of Labor Day weekend. Hurricane Dorian was barreling towards Miami, and the Governor had declared a state of emergency the night before.[8] Mr. Pike was bonded

---

[8]   As Mr. Pike sat detained at the FDC with his wife at home with their sons, the Miami media market was saturated with news of the coming storm. *See, e.g.*, Harris, Alex. "Hurricane Dorian Hits

out before nightfall (far from a certain result given the 3-day weekend and widespread disruption to normal operations resulting from the hurricane threat), but the event was a vivid and dramatic lesson on the reality of the criminal justice system. It left an indelible impression on Mr. Pike and his family.

Mr. Pike's arrest and subsequent indictment, which were reported in the media and disclosed by Pike to his close friends and colleagues, have also caused him significant shame and reputational harm. For example, he has had to limit his public association with and advocacy on behalf of Crystal Academy, the school he founded with his wife and to which he has devoted so much of his professional life, lest his criminal conduct have a negative impact on the school. He remains active and dedicated behind the scenes, but Mary Palacio has taken over the lead role and now serves as CA's public face. Mr. Pike has been advised that, as a soon-to-be convicted felon, he may not serve as an executor of the trust for the benefit of his son David. And Mr. Pike struggles with concern over how his son Joshua will perceive and process his father's fall from grace. Some might view such consequences as trivial compared to confinement in a cell. But, of course, everything is relative, each defendant is a unique individual, and these consequences are far from trivial to a man for whom his family and his dedication to community service

---

Cat 2 and is still strengthening. Risk to South Florida grows," *The Miami Herald*, 30 Aug. 30, 2019, rev.7:16 A.M. https://www.miamiherald.com/news/weather/hurricane/article234487722.html ("'All residents, especially those along the east coast, need to be prepared for possible impacts,' DeSantis said in a statement, urging Floridians to have seven days of supplies on hand. 'As it increases strength, this storm has the potential to severely damage homes, businesses and buildings, which is why all Floridians should remain vigilant. Do not wait until it is too late to make a plan'").

have defined his life. A sentence of probation with monitoring will adequately punish and deter.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, Mr. Pike respectfully submits that a sentence of probation with location monitoring, as recommended by the Probation Office, is just and appropriate in this case. [9]


Dated: February 8, 2022                         Respectfully submitted,

                                                RASKIN & RASKIN, P.A.
                                                201 Alhambra Circle
                                                Suite 1050
                                                Coral Gables, FL.  33134
                                                Telephone (305) 444-3400

                                                /s/ Jane Serene Raskin
                                                JANE SERENE RASKIN
                                                Florida Bar No.: 848689
                                                jraskin@raskinlaw.com


                                                /s/  Martin R. Raskin
                                                MARTIN R. RASKIN
                                                Florida Bar No.: 315206
                                                mraskin@raskinlaw.com

---

[9] If the Court adopts this recommendation, Mr. Pike suggests that a curfew would be the most appropriate and efficient restriction. This would permit him to continue to address the daily, sometimes unpredictable, needs of David, Jr., such as driving him to and from various therapy sessions and outside activities and generally being available to accompany him out of the home and into the community while Mrs. Pike works full time at Crystal Academy. Mr. Pike suggests the particular type of location monitoring technology be left to the discretion of the Probation Office for the Southern District of Florida, so he may provide input for Probation's consideration depending on what technologies are available and deemed most appropriate under the circumstances. *See* PSR, pp. 37-38.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 8, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

/s/  Jane Serene Raskin
JANE SERENE RASKIN