

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 11, 2022

**BY ECF AND HAND DELIVERY**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. David Pike*, S11 17 Cr. 630 (ER)

Dear Judge Ramos:

    The Government respectfully submits this letter in connection with the sentencing of defendant David Pike ("Pike" or the "defendant'), scheduled for Friday, February 18, 2022, at 10:00 AM. For all the reasons set forth below, a term of imprisonment at the top of the Guidelines range of 6 to 12 months would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

    Motivated by easy, fast, and enormous financial gain, Pike participated in a massive and sophisticated bank fraud scheme (the "Scheme") that utilized a series of investment funds (the "Fenero Funds") to disguise the origin and control of nearly $400 million. Pike was a lower-level member of the Scheme, but, as Pike concedes in his sentencing submission, "admittedly served a significant purpose in the operation of the Fenero Funds for the benefit of [co-defendant Mark] Scott and the 'investors.'" (Dkt. 449 at 10). The Scheme was designed in part to trick financial institutions around the world, including banks in the United States, into processing nearly $400 million in financial transactions that were derived from OneCoin and controlled by OneCoin's leader and co-founder, Ruja Ignatova ("Ignatova"), by disguising the transactions as legitimate investments in the Fenero Funds. The Scheme was difficult to detect, elaborate, and complex—it involved the use of a fund manager registered in the British Virgin Islands; offshore bank accounts; and a series of offshore investment funds (*i.e.*, the Fenero Funds), which were all designed to conceal the Scheme from banks, financial institutions, and law enforcement.

    Pike's primary role was to assist with the day-to-day operation of the Funds. Specifically, Pike regularly sent documents and application forms concerning the fake investors in the Fenero Funds to banks and other financial institutions. Pike also routinely interfaced with members of Ignatova's team in order to gather this type of information for the fake investors. Pike received approximately $2 million during the Scheme, which he has agreed to forfeit.

Undeterred by the arrest of co-defendant Mark Scott in this case, Pike made false statements to federal law enforcement agents during an interview on or about December 4, 2018. Specifically, Pike attempted to minimize his conduct by denying that he had known (contemporaneously) that the funds received by the Fenero Funds were derived from OneCoin and controlled by Ignatova. Pike in fact knew that at least a substantial portion, and potentially all, of the funds sent through the Fenero Funds were derived from OneCoin and belonged to Ignatova.

## Background

**I.    Offense Conduct**

    A.    OneCoin Fraud Scheme

        1.    *Background on OneCoin*

OneCoin was founded by Ignatova and Sebastian Greenwood. (PSR ¶ 11). Its head office is in Sofia, Bulgaria. (PSR ¶ 11). OneCoin markets and sells a purported digital cryptocurrency by the same name. (PSR ¶ 11). Approximately 3.5 million people have invested in OneCoin cryptocurrency packages. (PSR ¶ 11). OneCoin took in over $2 billion in criminal proceeds. (PSR ¶ 11). OneCoin began operating in the United States in or around 2015. (PSR ¶ 11).

OneCoin markets its fake cryptocurrency, "OneCoin," through a global multi-level marketing ("MLM") network of OneCoin members. OneCoin Ltd. has promoted various "trader packages" priced at, for example, between €100 and €100,000 euros, including "starter" packages, "tycoon trader" packages, and Power Packs. Purchase of a tycoon trader package provides access to "educational materials" and "tokens." According to OneCoin's representations to the public, "tokens" are used to secure positions in OneCoin's "mining pools," depicted in promotional materials as computer hardware used to "mine" OneCoins. (PSR ¶ 12).

OneCoin has falsely claimed that the value of OneCoin is based on market supply and demand. For example, in one set of OneCoin promotional materials, OneCoin falsely claimed that "as more and more members join, and the demand for tokens gets higher and higher it is only natural that the price of the tokens increases. With every new member joining One[Coin], the demand grows and the price . . . grows." OneCoin added that "as more and more new members join – the price again rises – again a split happens. Congratulations, you AGAIN doubled your money." (PSR ¶ 12).

The purported value of a OneCoin has grown steadily from €0.50 to approximately €29.95 per coin, as of in or about January 2019. (GX 3007, Tr. 158). The price of OneCoins has never decreased in value. (PSR ¶ 13).

OneCoin has claimed to have a private "blockchain," or a digital ledger identifying OneCoins and recording historical transactions. OneCoin's private blockchain may be contrasted with Bitcoin's blockchain, which is decentralized and public. In or around 2015, Ignatova falsely represented to the public that the OneCoin blockchain had been audited by an external auditor. In reality, the audit report was fake and had been drafted by employees at OneCoin, even though it claimed to be an external audit. (PSR ¶ 13).

2. *Details of the OneCoin Fraud Scheme*

In or around the summer of 2014, Ignatova and Greenwood began developing the concept and payout plan for OneCoin. Emails show that Ignatova and Greenwood developed OneCoin's unsustainable compensation structure for the purpose of enticing people to invest in OneCoin trader packages, including the false promise that investors would make a five-fold or ten-fold investment return. For example, on June 11, 2014, Ignatova wrote to Greenwood concerning the OneCoin business plan:

> It might not be [something] really clean or that I normally work on or even can be proud of (except with you in private when we make the money) – but . . . I am especially good in this very borderline cases [sic], where the things become gray – and you as the magic sales machine – and me as someone who really can work with numbers, legal and back you up in a good and professional way – we could really make it big – like MLM meets bitch of wall street ;-)
>
> * * *
>
> Your main sales argument is: **after 2 splits a member makes out of 5.000 USD 25.000 USD. You should be able to sell this** ☺ . . . I also added an **Extra Bonus for all members joining the Presales** . . . they can do actually 3 splits. Which means that they will actually **have 10x their investment**. 2 splits is 5x your money. So of course, everybody who is greedy will go in with 5.000 USD.

(PSR ¶ 14).

In another email on or about August 9, 2014, Ignatova sent Greenwood her thoughts on an "exit strategy" for OneCoin. The first option that Ignatova listed was, "Take the money and run and blame someone else for this (standard approach, see Wenyard)." As described in further detail below, Ignatova later adopted this exit strategy, disappearing entirely from public view in or around October 2017. (PSR ¶ 15).

As noted above, contrary to OneCoin's public representations, the value of OneCoin is determined internally and is not based on market supply and demand. Furthermore, contrary to OneCoin's public representations, OneCoins are not mined, but have instead been auto-generated and then distributed to members on an as-needed basis. (PSR ¶ 16).

OneCoin made numerous additional misrepresentations to investors to induce them to purchase OneCoins. Among other false representations that OneCoin made to the public were that: (1) OneCoin was going to have a public exchange where OneCoin investors could buy and sell OneCoins for fiat currency; (2) OneCoins could be used as a global currency; (3) OneCoin would have a foreign exchange (also known as "FX" or "forex") market where OneCoin investors could trade their OneCoins and other real currencies such as Euros and dollars for other currencies; and (4) OneCoin would have an investment fund where OneCoin investors could invest OneCoins

in real assets. OneCoin indicated to the public that it would have a public exchange by a specific date on several occasions; to this date, OneCoin has never had a public exchange. (PSR ¶ 17).

### 3. *Ignatova's Flight*

In or about October 2017, after learning that she was the subject of an FBI investigation, Ignatova fled with a bodyguard on a one-way flight to Athens, Greece. Ignatova has since made no appearances at any public OneCoin events and has made no public statement regarding her whereabouts. Ignatova has not been seen or heard from by even her close family, including her brother Konstantin Ignatov. (PSR ¶ 18).

After Ignatova's flight and disappearance, Ignatova's brother Konstantin assumed high-level positions at OneCoin. Prior to Ignatova's disappearance, Konstantin was Ignatova's personal assistant at OneCoin. By in or about mid-2018, after Ignatova had disappeared, Konstantin assumed one of the top leadership positions at OneCoin. (PSR ¶ 19).

### B. Money Laundering and Bank Fraud Scheme

#### 1. *Introduction of Mark Scott to Ignatova*

As banks around the world began to catch on to the OneCoin fraud scheme, banks became unwilling to handle OneCoin fraud money. (PSR ¶ 40). OneCoin could not open bank accounts in the name of "OneCoin," and instead had to hide the origin of the funds in various accounts, and the purpose of the transfers out of those accounts. (*Id.*).

Gilbert Armenta ("Armenta"), who was the boyfriend of Ignatova and was also one of Ignatova's main money launderers, assisted OneCoin with some of its banking problems. (PSR ¶ 21). As of late 2015, Armenta had begun laundering OneCoin fraud scheme proceeds for Ignatova. (*Id.*). Around that same time, Armenta introduced Mark Scott to Ignatova. (*Id.*).

At the time of this introduction, Scott, who is a trained corporate lawyer, was a partner at the law firm Locke Lord LLP and was based in Miami, FL. (PSR ¶ 22). Scott had extensive experience in representing private equity funds. (*Id.*). Scott leveraged that experience to construct a sophisticated money laundering vehicle for Ignatova, involving transfers of hundreds of millions of dollars of fraud scheme proceeds disguised as investments into a series of investments funds (collectively referred to as the "Fenero Funds"). (*Id.*). Scott resigned from his position as a partner at Locke Lord in or about September 2016 so that he could work full time laundering Ignatova's money. Pike is not alleged to have participated in the money laundering conspiracy.

#### 2. *Mark Scott and David Pike Set up the Fenero Funds*

After Scott was introduced to Ignatova in September 2015, Scott and his friend Pike began to set up a series of fake investment funds over the next several months. Among other things, Scott incorporated MSS International Consultants (BVI), Ltd. ("MSSI LTD"), which was a fund manager registered in the British Virgin Islands. (PSR ¶ 23). Beginning in or about March 2016, Pike was appointed as a director of MSSI LTD; Pike also served as the Chief Operating Officer of MSSI LTD.

Through MSSI LTD, Scott and Pike operated a series of purported investment funds. Specifically, MSSI LTD owned and operated a series of fake investment funds, which were used to launder proceeds from the OneCoin fraud scheme, including the following purported investment funds: Fenero Equity Investments L.P. ("Fenero"), Fenero Equity Investments II, L.P. ("Fenero II"), and Fenero Financial Switzerland L.P. ("Fenero Switzerland"), each of which was an approved fund regulated in the British Virgin Islands. (PSR ¶ 24). MSSI LTD also owned and operated Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman"), an investment fund organized in the Cayman Islands (together with the British Virgin Islands Fenero funds, the "Fenero Funds"). (*Id.*).

Scott and Pike operated offshore bank accounts in the Cayman Islands for each of the Fenero Funds (the "Fenero Fund Accounts"). (*Id.*). The Fenero and Fenero Switzerland accounts were held at DMS Cayman bank, and the Fenero Cayman and Fenero II accounts were held at Deutsche Bank Cayman. (*Id.*).

Scott served as the Director of Fenero Equity Investments (Ireland), Limited, an entity formed in the Republic of Ireland on April 5, 2016. (PSR ¶ 25). Scott and a co-conspirator named Irina Dilkinska ("Dilkinska") served as directors of two related companies also formed in Ireland: Fenero Tradenext Holding Limited and Fenero Pct Holdings Limited. (*Id.*). Among other things, Dilkinska was an employee at OneCoin who was responsible for managing shell companies for OneCoin that were used for money laundering. (*Id.*). Dilkinska was one of the primary employees at OneCoin who assisted Scott with coordinating the laundering of OneCoin fraud proceeds.

Pike served as a director of MSSI BVI and assisted Scott with the day-to-day operation of the Fenero Funds. Among other things, Pike regularly sent documents, including know-your-customer ("KYC") information and application forms concerning the fake investors in the Fenero Funds, to banks and other financial institutions. Pike also corresponded with members of Ignatova's team regarding KYC documentation for the so-called investors in the Fenero Funds. (PSR ¶ 26). As noted below, Pike and Scott used the Fenero Funds to disguise the true nature and ownership of funds that were transferred on behalf of Ignatova. While Scott was a leader in the conspiracy, Pike was not, and instead typically executed instructions that he received from Scott and others.

       3.   *Scott's Use of the Fenero Funds to Launder OneCoin Proceeds*

After Scott was introduced to Ignatova through email, Scott traveled to London in February 2016 and met with Ignatova in person. (PSR ¶ 27). This was one of approximately six international trips that Scott took to meet with Ignatova in 2016 and 2017. (*Id.*). After Scott opened bank accounts in the names of each of the Fenero Funds, between May 2016 and October 2016, the Fenero Fund Accounts collectively received wire transfers totaling approximately €364 million and $10 million, which Scott represented to be investments into the Fenero Funds. (*Id.*). These wire transfers originated from approximately 10 different bank accounts held at banks located in Singapore, Germany, Hong Kong, the United Kingdom, and the United States. (*Id.*). These bank accounts were registered under a set of shell corporations, including a set of affiliated companies with variations of the name International Marketing Services ("IMS"), as well as B&N Consult Ltd. ("B&N"), and Fates Group. (*Id.*). IMS was owned by co-conspirator Frank Rickets;

B&N was owned by co-conspirator Dilkinska; and Fates Group was owned by co-conspirator Armenta.

While IMS, B&N, and Fates Group were "investors" into the Fenero Funds on paper, all the money being transferred into Scott's funds in fact belonged to Ignatova and was derived from the OneCoin scheme. (PSR ¶ 28). After the Fenero Funds received the above-described deposits, between approximately May 2016 and July 2018, the Fenero Fund Accounts funded approximately €282,000 in wire transfers to a series of Fenero Fund bank accounts held at the Bank of Ireland in the Republic of Ireland. (*Id.*). Scott also transferred tens of millions of Euros back to Bulgaria from the Fenero Funds, disguised as fake loans. (*Id.*). Scott subsequently transferred approximately €185,000,000 from the Bank of Ireland to the accounts of another one of Ignatova's money launderer's, named Aamer Abdulaziz. (*Id.*). As noted above, Pike is not charged in the money laundering conspiracy.

4. *Lies to Effectuate the Transfer of Ignatova's OneCoin Fraud Proceeds*

Throughout the charged conspiracy, Scott, Pike, and their co-conspirators made numerous misrepresentations to banks and financial institutions to cause them to unwittingly transfer proceeds from the OneCoin fraud scheme on behalf of Ignatova. Specifically, Scott, Pike, and their co-conspirators misrepresented to banks and financial institutions the source of the funds they were transferring, the purpose of those wire transfers, and who controlled those funds.

For example, in or around April 2016, Scott provided a Managing Director at Apex Group Ltd., an investment fund administrator, with a document describing Fenero and its mission, investment strategy, and investor base (the "Mission Statement"). As a fund administrator, Apex was responsible for, among other things, conducting anti-money laundering and KYC checks, reviewing the source of wealth for investors, and transferring the investors' money into the fund or its investments. (PSR ¶ 30). The Mission Statement falsely stated, among other things, that:

> Fenero Equity Investments, L.P., is the first of a series of $100,000,000 open ended investment funds located in the British Virgin Islands (the "Fund" or "Fenero"), focusing on investments in the financial services industry in Europe. . . . Due to its small investor base of wealthy families and middle market companies (the "Initial Investors") and its narrow investment strategy, the Fund requires very little staff. . . . Fenero will always fully control its capital and conduct its own stringent "KYC" on investors and final due diligence on any target companies internally.

> Fenero has been created at the request of a select group of European based families and companies . . . . The Fund will basically be administered and managed in [the] form of a multi "Family Office" by MSS International Consultants (BVI), Ltd. . . . which is ultimately owned by Mark S. Scott . . . [who] currently is the Managing Partner of [the Law Firm], an Amlaw 50 firm, in Miami. The initial Investors of Fenero have been represented legally by Mr. Scott ranging from three (3) to twelve (12) years and have closed on in excess of $2,100,000,000 in transactions under Mr. Scott's business and legal guidance. (*Id.*).

Many of the statements contained in the Mission Statement were false. For example, Scott plagiarized entire sections of the Mission Statement from other mission statements online, including representations in the "track record" section of the Mission Statement. (PSR ¶ 31). In addition, Scott's representations in the Mission Statement about the initial investors into his fund and Scott's prior relationship with those so-called investors were also false. Furthermore, the subscription agreements for Scott's investors did not disclose that the investors, such as B&N and IMS, or the principals of those investor companies, Irina Dilkinska, and Manon Hubenthal, were in any way connected to OneCoin and/or Ignatova. (*Id.*). As noted above, all the money transferred through the Fenero Funds belonged to Ignatova and was derived from OneCoin. (*Id.*).

Scott also made numerous misrepresentations to Apex in response to questions that Apex raised regarding the Fenero Funds' investors and, specifically, the source of the investors' wealth. In or about July and August 2016, Apex began conducting enhanced due diligence on the Fenero Funds. (PSR ¶ 32). Among other issues that triggered the enhanced due diligence were a series of loans that Scott made to himself from the Fenero Funds in a short time frame, as well as suspicious transactions involving IMS and B&N, and a lack of clarity as to the relationship between IMS and B&N. (*Id.*). During its due diligence, Apex attempted to obtain additional information on the source of wealth for the investors in the Fenero Funds. (*Id.*). Around this same time, in late July 2016, Scott inadvertently sent an email to Apex that contained a forwarded email from Dilkinska, with Dilkinska's OneCoin email address. (*Id.*). That same email also revealed that there was a connection between Dilkinska and another Fenero Funds investor, Star Merchant. (*Id.*). Prior to sending that email, Scott had successfully covered up any connection between the purported investors in the Fenero Funds and OneCoin. (PSR ¶ 33). Upon learning of the connection between the investors in the Fenero Funds and OneCoin, Apex held a series of emergency meetings and made various notifications to government agencies. (*Id.*).

While Apex was conducting enhanced due diligence, Scott and Pike took a number of steps to conceal the connection between the Fenero Funds and OneCoin, and to convince Apex that it should continue to transfer funds out of the Fenero Funds as requested by Scott. Among other things, Scott and his co-conspirators doctored letters of comfort on behalf of two lawyers; created and sent backdated wire instruction letters to Apex; and forged a set of agreements between IMS and B&N. As to the doctored lawyer letters, Scott first sent a draft letter to a lawyer named Martin Breidenbach on August 2, 2016, and instructed Breidenbach to "put this letter on your letterhead, sign it . . . and e-mail the entire package to Mr. Spendiff." (PSR ¶ 34). The letter was intended to address Apex's concerns about the source of funds being transferred into the Fenero Funds on behalf of IMS, and the relationship between IMS and B&N. (*Id.*). The letter falsely stated, among other things, that "IMS and B&N collaborate on providing large sales and marketing companies in the direct sales industry with process and systems solutions and support" and that B&N had earned at least 130,000 Euros through its joint venture with IMS in the preceding twelve months. (*Id.*). Breidenbach sent the fake letter, which had been drafted by Scott, to Apex. (*Id.*). On the same day, Scott sent a similar request to a Bulgarian lawyer named Viktor Rashev and asked Rashev to "put the attached letter on your firm's letterhead, sign it and send it to Mr. Spendiff." (PSR ¶ 35). The letter stated, among other things, that B&N had earned approximately 200,000 Euros in the prior 14 months and that B&N had earned its fees "for the use of B&N's proprietary consulting services, support and software solutions." (*Id.*). Rashev signed the letter and sent it to Apex that same day. (*Id.*). Scott knew that these representations about the source of wealth for

B&N and IMS were false. (*Id.*). In reality, the money that was transferred through these shell companies to the Fenero Funds belonged to Ignatova and was derived from the OneCoin scheme.

As noted above, one of the concerns raised by Apex was the relationship between IMS and B&N. To address this concern and justify the flow of funds into the Fenero Funds on behalf of those entities, Scott backdated wire instruction letters and forged a set of agreements between IMS and OneCoin, which were then sent to Apex. As to the backdated wire instruction letters, Scott instructed other co-conspirators from OneCoin, including Dilkinska, to sign a set of fake wire authorization letters that justified the transfer of tens of millions of Euros on behalf of B&N. Specifically, Scott instructed other co-conspirators, copying Pike and Ignatova, that "It would also be great if you could sign some of the letters with a different pen so they do not look so mechanically produced. Maybe Irina [Dilkinska] can print them wherever she is and sign and scan them back to you one at a time. Maybe you can sign others in the office with her automatic signature." (PSR ¶ 37). Pike then sent the fake wire instruction letters to Apex. (*Id.*). Scott also forged a set of two agreements between OneCoin and IMS, changing the fee that IMS was supposed to receive under the agreements from 1% in the original agreements, to 20% and 22% in the forged agreements. (*Id.*). Scott then sent the forged contracts to Apex. (*Id.*). Scott appeared to design the terms of the forged contracts in an attempt to provide support for the large volume of payments—purportedly for the purpose of licensing technology to OneCoin—made by the IMS companies to the Fenero Funds.

After receiving these materials from Scott, Apex continued to refuse Scott's request to transfer funds out of the Fenero Funds. At that point, Apex had concluded that it had "been provided [by Scott] with fraudulent documents that hid the relationship with OneCoin." (PSR ¶ 38). In a final attempt to try to convince Apex to transfer funds out of the Fenero Funds, Scott demanded a phone call with Apex. During the resulting call, Scott continued to lie to Apex about the underlying source of wealth for the money transferred into the Fenero Funds. For example, Scott falsely claimed that the money was derived by and belonged to Dilkinska, stating that Dilkinska was "inventing ways to, how should I say, to materially [U/I] access to potential buyers for those direct sales companies. That's her biggest strength that she's doing here." (*Id.*).

5. *Scott's and Pike's Lies to United States Banks*

Throughout the conspiracy, Pike and his co-conspirators took steps to ensure that financial institutions did not discover the link between the Fenero Funds investors and OneCoin and Ignatova. For example, on or about September 14, 2016, Pike emailed several individuals associated with OneCoin and Ignatova, copying Scott, stating in part: "[I]t is very important that you know that under the current circumstances we would have to list Dr. Ignatova as the UBO of INNOIN and as I understand it this is unacceptable for everyone involved. Please discuss this internally as you develop the INNOIN profile." This is just one of many examples in which Scott and Pike took steps to hide the connection between the Fenero Funds and OneCoin and Ignatova.

The deceptive Scheme involved lies to United States banks, some of which were federally insured. For example, in or about July 2016, Scott disguised the transfer of OneCoin fraud proceeds on Ignatova's behalf in the form of a fake loan to CryptoReal Investments Trust Ltd. ("CryptoReal"), which was allegedly purchasing an oil field from Barta Holdings Limited ("Barta"). Under the terms of the purported deal, CryptoReal was going to borrow €30 million

from Fenero. (PSR ¶ 39). Scott and Martin Breidenbach represented to Apex that Breidenbach was the ultimate beneficial owner of CryptoReal. (*Id.*). During this deal, Scott and his co-conspirators also represented to Apex that Neil Bush was the authorized representative of Barta. In an email dated July 12, 2016, Scott requested that Apex wire "an aggregate amount of 30 million dollars U.S.D. from our above-referenced account at DMS Bank to the party as follows, listed at DBS Bank Hong Kong, beneficiary Barta Holdings Limited, with an address in Hong Kong," and represented that the purpose of the wire was "Loan to CryptoReal Investment Trust LTD (BVI) Martin BVI)/Martin Breidenbach for acquisition of Madagascar Oil Field." (PSR ¶ 40). This money was not a real loan, but rather was being disguised as a loan so that the banks and financial institutions would authorize the transfer, which was on Ignatova's behalf (not Breidenbach's). (*Id.*). The funds for this fake loan ultimately were transferred through a U.S. dollar correspondent bank account at Bank of New York Mellon in Manhattan. (*Id.*).

In another set of transactions, Scott and Pike received approximately $10 million into the Fenero Funds from accounts in the name of "Fates Group," controlled by Armenta in the United States. As described above, Armenta was Ignatova's boyfriend and was also one of Ignatova's primary money launderers. Scott was aware that the funds Armenta transferred from Fates Group in fact belonged to Ignatova, were derived from the OneCoin fraud scheme, and were being disguised as investments into the Fenero Funds so that Armenta and Scott could move them on Ignatova's behalf. For example, one transfer of $5,000,000 from an Armenta-controlled United States bank account at Morgan Stanley in the name of Fates Group was disguised as investments of $3 million into "ZIIXI" and $2 million into "XIII." (PSR ¶ 41). Based on this misrepresentation, Morgan Stanley understood that ZIIXI and XIII were purportedly investment funds and that the purpose of the wire transfers was to invest in those funds. (*Id.*). To successfully transfer the funds to Scott's Fenero Funds, Armenta also falsely represented that these Fenero Funds were a private equity firm that invested in, among other things, renewable energy, such as windmills. (*Id.*).

During the charged bank fraud conspiracy, Pike personally received appropriately $2,099,330 in United States currency, money that came directly from OneCoin victims. Pike has agreed to forfeit these funds.

### C. Pike's False Statements

On December 4, 2018, Pike made false statements during a meeting with federal law enforcement agents. Specifically, Pike falsely stated that he did not have an understanding that the money managed in the Fenero Funds was derived from Ignatova or OneCoin, until after Scott was publicly charged in September 2018. In actuality, Pike was aware that approximately $400 million transferred into the purported private equity funds that he helped to manage belonged to Ignatova and were derived from the OneCoin multi-level marketing scheme. (PSR ¶ 42).

## Discussion

As set forth above, Pike participated in a bank fraud conspiracy and attempted to cover up his role in the Scheme by lying to federal law enforcement agents in December 2018. A sentence at the top of the Guidelines range of 6 to 12 months' imprisonment is warranted and necessary here, based on the sentencing factors the Court must consider under 18 U.S.C. § 3553(a).

*Seriousness of the Offense and Need for Just Punishment*

A term of imprisonment at the top of the Guidelines range is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

The defendant's criminal conduct in this case was serious: Pike participated in a highly sophisticated international bank fraud scheme. The Scheme utilized fake investment funds to hide the source of the funds being transferred (OneCoin), and the owner of those funds (Ignatova). The Scheme involved the incorporation and registration of a BVI fund manager; and the operation of numerous offshore investment funds, and corresponding offshore bank accounts, in locations such as the Cayman Islands and Ireland. The Scheme was sophisticated and multi-layered. In particular, the Scheme involved the use of fake investment funds to transfer the funds through a series of international bank accounts, as well as the use of fake investors, with their own corresponding bank accounts and intermediary companies that sent the OneCoin funds on behalf of Ignatova. In other words, on paper, the "investors" in Fenero looked like they were companies that had nothing to do with OneCoin or Ignatova: IMS, B&N, and Fates Group. The funds were sent to the Fenero bank accounts from bank accounts held around the globe in Singapore, Germany, Hong Kong, the United Kingdom, and the United States. (PSR ¶ 27). This complex web of financial transactions hid the true origin and control of the wealth sent through the Fenero Funds from financial institutions around the world.

Pike's criminal conduct was brazen. For example, in the summer of 2016, when Apex began to conduct enhanced due diligence after learning of the connection between a Fenero "investor," Dilkinska, and OneCoin, Pike and Scott *deliberately* withheld from Apex "any documents or information that would reveal the relationship between any of the investors and OneCoin or Ignatova." (Dkt. 449 at 9). Pike knew what he was doing was wrong and that by withholding the requested information he was misleading the banks. But with the looming prospect of a big payday, Pike chose to put his own financial interests above the law.

In addition, although Pike was by no means a leader or architect of the bank fraud Scheme, his role "admittedly served a significant purpose in the operation of the Fenero Funds." (Dkt. 449 at 10). Notably, the Fenero Funds were operated entirely by Scott and Pike. Therefore, Pike's assistance, which essentially amounted to a full-time job, was vital to carrying out the day-to-day tasks that were needed to operate the Funds. For example, Pike regularly sent documents, including KYC information and application forms concerning the fake investors in the Fenero Funds, to banks and other financial institutions. Pike understood that by sending these materials to financial institutions he was actively tricking them into believing that the money belonged to the "investors" in the Fenero Funds. Pike also frequently corresponded with members of Ignatova's team regarding KYC documentation for the so-called investors in the Fenero Funds.

Finally, although the Scheme did not result in banks losing money on the OneCoin-related transactions, the defendant's Scheme, and others like it, are enormously costly for banks and other similar financial institutions. As a result of criminal activity like the defendant's, financial institutions must expend significant financial resources to protect the integrity of the global

financial system by detecting and preventing criminal actors like the defendant from misusing bank accounts to facilitate criminal activity.

In sum, the totality of Pike's conduct during the Scheme was very serious, and a term of imprisonment at the top of the Guidelines range is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

*Adequate Deterrence to Other Sophisticated and Calculating Criminals*

A term of imprisonment at the top of the Guidelines range is also necessary to adequately deter other sophisticated and calculating criminals like Pike from similar criminal conduct. 18 U.S.C. § 3553(a)(2)(B). General deterrence is that much more important in a case like this, where the conduct was both personally profitable and also exceedingly difficult to detect.

First, the need for a sentence of imprisonment to deter others is particularly strong here, because the Scheme was extremely profitable. The defendant alone personally profited approximately $2 million for assisting Scott in the Scheme, and Scott profited more than $50 million. Given the enormous financial incentives for criminals like Pike and his co-conspirators to engage in similar schemes, a substantial sentence is necessary to adequately deter others from doing so.

Second, it is critical to deter sophisticated schemes like this. Pike and Scott took numerous steps to ensure that they were not caught. The use of fake investment funds made it exceedingly difficult for financial institutions or for law enforcement to detect the true nature of the financial transactions. Further, Scott and Pike conducted nearly the entire criminal operation offshore: they incorporated funds and opened bank accounts overseas and received funds in primary part from bank accounts and entities overseas. The use of overseas bank accounts and entities to facilitate the Scheme made it more difficult to tie the Scheme back to Pike and Scott. These types of techniques can thwart law enforcement efforts to investigate and prosecute criminals like Pike and Scott, who were both based in the United States throughout the conspiracy.

A sentence at the top of the Guidelines range is therefore needed to deter others from pursuing similar schemes, which are sophisticated, highly lucrative, and difficult to detect by law enforcement officials.

*Protecting the Public from Further Crimes of the Defendant*

The defendant's motive for participating in the Scheme, as well as his actions after co-defendant Scott was arrested, demonstrate that a sentence at the top of the Guidelines range is necessary to achieve specific deterrence and to protect the public from further crimes of the defendant. 18 U.S.C. §§ 3553(a)(2)(B) and (C).

Despite a stable childhood, good education, and history of stable employment, Pike chose to participate in a significant criminal conspiracy. Pike appears to have been motivated by greed; he was not impoverished, but rather he saw an opportunity to earn far more money through illegal activity than through legitimate means. Pike chose to break the law for no other purpose than to

line his own pockets. Furthermore, it is deeply troubling that, when Pike was caught, he chose to double down, and committed yet another crime by lying to federal law enforcement agents in an effort to hide the extent of his criminal conduct. Pike lied despite fully understanding the seriousness of the situation; his co-conspirator Scott had already been arrested, and Pike was being interviewed by federal law enforcement agents about his participation in the same conduct. Although many of the factors set forth in the defendant's sentencing submission indicate that the need for specific deterrence is relatively low in this case, some level of specific deterrence is still warranted here, and necessary to protect the public from further crimes of the defendant. A sentence at the top of the Guidelines range is therefore fair and appropriate.

*History and Characteristics of the Defendant*

The court must also take into consideration the history and characteristics of the defendant, which are set forth at length in the defendant's sentencing submission. *See* 18 U.S.C. § 3553(a)(1). The Government will not repeat them here. As noted by Probation, Pike "has . . . made significant contributions to his community in the form of bringing awareness and providing services to families impacted by autism." (PSR at 34). The defendant is also clearly an important presence for his autistic son. Although these facts are relevant to the Court's consideration of a fair and appropriate sentence, they do not outweigh the other factors set forth above. When viewing all these factors together, a sentence at the top of the Guidelines range of 6 to 12 months' imprisonment is sufficient, but not greater than necessary, to serve the legitimate purpose of sentencing.

## Conclusion

For the foregoing reasons, the Court should impose a term of imprisonment at the top of the Guidelines range, in addition to forfeiture.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: s/_____
Nicholas Folly
Juliana Murray
Assistant United States Attorneys
(212) 637-1060

Cc:   Defendant (by ECF)